F. E. HUNT v. KANSAS AND MISSOURI BRIDGE COMPANY.

1. AUTHORITY TO BRIDGE MISSOURI RIVER; *State Jurisdiction.* The legislature of the state of Kansas has the power to pass an act authorizing the organization of a corporation to build a bridge across the Missouri river at a place where said river forms the boundary line between the state of Kansas and the state of Missouri.

2. CORPORATION LAW; *Purposes of Corporations.* The act of February 27th, 1866, (ch. 57, laws of 1866,) concerning corporations, authorizes the organization of a corporation for the purpose of building a bridge across the Missouri river at a place where said river forms the boundary line of the state.

3. CERTIFICATE OF INCORPORATION; *Charter; Description of Place.* Where the corporators of a bridge company who organized under said act described in their certificate of incorporation the bridge and its location as follows, to-wit: A "bridge across the Missouri river from the state of Kansas to the state of Missouri, at some point within the county of Leavenworth in the state of Kansas, and within the county of Platte in the state of Missouri," *held,* that the description should have been more definite and specific; but still, the description is not so indefinite and defective as to render the organization of the company wholly illegal and void; or at most it will not be declared illegal and void when the question of the existence of the corporation is raised collaterally and by setting up the defective description as a defense to an action brought by the com-

pany against a stockholder to recover for assessments due and unpaid on his stock, and especially not where the defendant in the action was one of the original stockholders, participated in the organization of the company, and was elected and served as one of the first directors of the company, and where other stockholders have paid for their stock, or a portion thereof, and the bridge has been built.

4. CORPORATION—*When it is Created.* The said corporation was created when the certificate of incorporation was filed with the secretary of state.

5. ——— *Stockholders; Liability for Assessments on amount of Subscribed Stock.* When ten per cent. of the capital stock of a bridge company has been subscribed, and the company has organized under the provisions of said act by electing directors and other proper officers, the company is then legally organized for "the transaction of all business of the corporation," and may compel each stockholder to pay the full amount of the stock for which he has subscribed, although only ten per cent. of the capital stock has yet been taken by individual stockholders.

### Error from Leavenworth District Court.

THIS action was commenced in the district court by the *Kansas & Missouri Bridge Company* to recover from *Hunt* $2,000 alleged to be due from him on assessments made by the plaintiff's board of directors on the amount of stock subscribed for by *Hunt* in said company. The petition alleges the following facts: On the 16th of November 1867, a certificate for the organization of said corporation was duly filed in the office of the secretary of state of the state of Kansas, which certificate is as follows:

STATE OF KANSAS, COUNTY OF LEAVENWORTH, SS.:

The undersigned residents of the state of Kansas hereby associate themselves into a company or body corporate as follows:

*First:* The name of such company or corporation, and by which it shall be known, shall be the "Kansas and Missouri Bridge Company."

*Second:* The places where such company or incorporation intend to operate are in the states of Kansas and Missouri, and in those parts of said states contiguous to and adjoining the Missouri river in the county of Leavenworth in the state of Kansas, and in the county of Platte in the state of Missouri, and the place of its principal office is in the city of Leavenworth.

*Third:* The amount of capital stock of said company or

corporation shall be the sum of one million dollars, and the amount of each share shall be the sum of one hundred dollars.

*Fourth:* The objects for which said company or corporation desire to be incorporated are to make, build, construct, equip, furnish, manage, work and control a railway, wagon and foot bridge across the Missouri river, from the state of Kansas to the state of Missouri, at some point within the county of Leavenworth in the state of Kansas, and within the county of Platte in the state of Missouri, subject to such rules and regulations as to freight and tolls or otherwise, as the stockholders or trustees hereafter appointed shall designate and establish, and also to construct, build, manage and control a telegraph line across the said river with the necessary connections thereof, said telegraph line to be in conjunction with or in close proximity to said bridge.

*Fifth:* The said company or corporation desire to hold real estate and acquire and convey all such real estate as well as personal property, as may be necessary to carry into effect the objects of this incorporation.

Said certificate was dated, "Leavenworth, November 12th, 1867," and was signed by 31 citizens of the state of Kansas. On the 21st of December 1867 said corporators signing said certificate, having given due notice of the time and place of opening books for subscriptions to the capital stock of said corporation, organized by electing a chairman and secretary, and having "resolved, that no person shall be permitted to subscribe for more than $5,000 to the capital stock of said company until otherwise ordered, and that five per cent. shall be paid at time of making subscription," "the books were then opened and all present requested to subscribe." [The contract of subscription is set out in full in the opinion, *infra.*] The first name on the subscription contract was that of *F. E. Hunt,* plaintiff in error, who subscribed for fifty shares, $5,000. On the same day 285 other persons subscribed in the aggregate for 1,718 shares, and the county of Leavenworth subscribed for 2,500 shares. On the 28th of December 1867 the stockholders held a meeting and elected 23 directors, one of whom was *F. E. Hunt,* and effected a temporary organization. On the 2d of February 1869 said *Bridge Company*

made a contract with L. B. Boomer & Co. to build a bridge
at Leavenworth over the Missouri river, at and for the price
of $699,490.   Afterward other subscriptions were made to
the capital stock of said company as follows: L. B. Boomer
& Co. subscribed for 1,750 shares, the Chicago & Southwestern
Rly. Co. subscribed for 2,000 shares, and certain citizens of
Leavenworth subscribed for 23 additional shares, (making a
total of 7,991 shares, at $100 each, $799,100.)   The petition
further alleged that Boomer & Co. had completed said bridge
according to contract; admitted that *Hunt* paid five per cent.
($250) of his subscription at the time of making said sub-
scription; alleged that eight assessments (averaging ten per
cent. each) had been duly made by the board of directors on
the stock of said company subscribed for as aforesaid; that
the assessments so made on the stock held by *Hunt* amounted
to $4,000, of which $2,000 had been paid; that due demand
had been made of *Hunt* for the remaining $2,000, and that
he refused to pay the same.   The answer of defendant is as
follows:

(*Title.*)   And now comes F. E. Hunt, defendant, and for
his answer to the petition of the plaintiff denies all, each and
every allegation and averment therein contained.

II. And for a second and further defense said defendant
avers that heretofore, to-wit, on the 29th of June 1871, the
said plaintiff and L. B. Boomer & Co. made and executed
their certain written instrument, and mutually delivered the
same to each other, and thereby the said plaintiff gave,
granted and assigned unto said L. B. Boomer & Co. the
amount then remaining unpaid on private stock subscriptions
to the capital stock of said plaintiff, including the amount
unpaid on the subscription of this defendant to the capital
stock of said plaintiff.

III. And for a third and further defense said defendant
denies that the Chicago & Southwestern Railway Company
ever executed either of the pretended written instruments or
contracts or subscriptions in said petition mentioned.   And
this defendant denies that he signed or executed the pretended
written instrument in said petition referred to as including
the pretended subscription list therein mentioned, otherwise
than by signing a writing substantially like the writing at

the head or commencement of said list, without L. B. Boomer & Co., or the county of Leavenworth, or the Chicago & Southwestern Railway Company having executed the same instrument, or any pretended written instrument in said petition mentioned, referred to or set forth. (This defense sets forth the contract between the plaintiff and Boomer & Co. for building the bridge at Leavenworth, dated February 2, 1869.)

IV. And for a fourth and further defense said defendant refers to the third ground of defense herein as part hereof, and avers that heretofore, on the 8th of July 1870, one George R. Hines, as president of said plaintiff, and one Frederick H. Winston, as president of the Chicago & Southwestern Railway Company, fraudulently, without having been authorized, appointed or empowered so to do, pretended to make and execute, for and on behalf of the last-named company, and of said plaintiff, a certain pretended written instrument, of that date, a copy of which is herewith filed, and made part hereof; and that afterward, and on the 19th of September 1870, the said Hines, as such president of said plaintiff, and the said Winston, as such president as aforesaid, fraudulently, without having been authorized, appointed or empowered so to do, pretended to make and execute, for and on behalf of said plaintiff and of the Chicago & Southwestern Railway Company aforesaid, a certain other pretended written instrument of that date, a copy of which is herewith filed, and made part hereof. And said defendant further avers, that there was not any contract or contracts ever made or entered into by and between said plaintiff and the Chicago & Southwestern Railway Company, nor did any person or persons or corporations or companies pretend to make any such contract or contracts in 1870, other than the two last-mentioned pretended written instruments, so made by said Hines and Winston without power or authority so to do, as aforesaid. And said defendant further avers, that the Chicago & Southwestern Railway Company aforesaid was never authorized or empowered to make, execute, or enter into, any or either of the pretended contracts or written instruments aforesaid, or in said petition mentioned, copied or set forth.

V. And for a fifth and further defense said defendant avers that, without being liable so to do, he has paid to said plaintiff, on and because of the supposed but really void subscription of this defendant, mentioned in the third ground of defense herein, divers large sums of money amounting in the aggregate to the whole amount thereof.

VI. And for a sixth and further defense said defendant refers to all and singular the above and foregoing parts of this answer as part hereof; and said defendant further avers, that said plaintiff has had, collected, and received, of and from divers sources, divers large sums of money amounting in the aggregate to the sum of $1,200,000, and that the amount thus collected, had and received by said plaintiff is and was sufficient, and largely in excess of the amount required to comply with the pretended contract with L. B. Boomer & Co., in said petition mentioned.

VII. And for a seventh and further defense said defendant avers that said plaintiff is not the real party in interest in this action, and that this action is not prosecuted for the use or benefit of said plaintiff, but the same is prosecuted for the use and benefit of, [naming 18 individuals, and three railroad corporations,] and divers other persons associated with them, to this defendant unknown, who have fraudulently combined and confederated together to take and convert to their own use all the assets, franchises, rights, privileges and property of said plaintiff.

The plaintiff demurred to the 4th defense stated in the answer, and replied denying generally the matters alleged in the 2d, 5th, 6th, and 7th defenses. And for reply to the 3d defense in said answer the plaintiff alleged "that the contract with L. B. Boomer & Co., therein set out, was made by the said plaintiff with said Boomer & Co., with the consent and at the request of the defendant herein, and that the said bridge was built and constructed by the said Boomer & Co. in pursuance thereof with the knowledge and consent of the defendant, and at the special instance and request of the defendant." The defendant demurred to this reply to the 3d defense. The action upon the issues so joined, was tried at the November Term 1872, before J. W. E., judge *pro tem.* The journal entry of the trial is as follows:

(*Title.*) "And now at this day comes the plaintiff herein by Messrs. S. & F., its attorneys, and also comes the defendant herein by R. C. and C. & W., his attorneys, and thereupon the demurrer of said plaintiff to the 4th defense in the answer herein of the defendant came on for hearing; and the defendant then suggested and claimed that the petition in this action does not state facts sufficient to constitute a cause

of action, and asked the court to carry said demurrer back to said petition, and to sustain the same to said petition. And thereupon the demurrer of the defendant to the reply of the plaintiff to the 3d defense in said answer also came on to be heard: and the defendant then also asked the court to carry said demurrer back to said petition, and to sustain the same to said petition, as well as to said reply of the plaintiff to said 3d defense. And the plaintiff thereupon suggested that said 3d defense was insufficient, and asked the court to carry said demurrer of the defendant back to said 3d defense, and to sustain the same thereto. And the said demurrers having been respectively argued by counsel, and duly considered by the court, thereupon the court here refuses to sustain the plaintiff's demurrer as to the said petition, and doth sustain said demurrer of the plaintiff to said 4th defense; and the court here doth refuse to sustain the demurrer of the defendant to said petition, but carrying said demurrer of the defendant back to said 3d defense doth sustain the same thereto. To which rulings and decisions of the court said defendant excepted."

And from said orders and decisions of the district court in overruling and sustaining said demurrers respectively, *Hunt* appeals, and brings the case here for review.

*Clough & Wheat*, and *Robert Crozier*, for plaintiff in error:

1. The Bridge Company brought its action in September 1872, against Hunt, to recover of him $2,000 with interest from the 26th of November 1870, as a balance it claims due it from him, as a subscriber for fifty of its shares, $5,000 in amount: and, alleges that assessments and calls were made by its board of directors on the stock so subscribed for. But said company does not allege or pretend that assessments or calls were made on all of its capital stock, *or that all of its capital stock has been taken or subscribed for*, but on the contrary, by its petition in effect admits that no subscriptions have been made for any of its capital stock, except 1,742 shares thereof, being $174,200 in amount. Nor, does it aver or pretend that $300,000 of *bona fide* subscriptions (unless it pretends the contracts aforesaid with Boomer & Co. and said Railway Company were subscriptions — which we sup-

pose they were not,) have been made to said capital stock, exclusive of the $250,000 subscription by said county. In his 3d defense he in effect denied having executed the subscription paper with Boomer & Co., or said county, or said railway company, and denied that said railway company ever executed either of the instruments, contracts, or subscriptions in said petition mentioned. By his 4th defense, Hunt made said 3d defense part thereof, and then set forth the pretended contracts mentioned as having been signed by the C. & S. W. Rly. Co., and alleged that Hines and Winston pretended to make the same without having been authorized, appointed or empowered so to do. We suppose that where a petition is insufficient, a demurrer to a defense or reply should be carried back and sustained thereto. (*Anthony v. Halderman*, 7 Kas., 50.) A demurrer searches the record, and should be carried back and sustained to the first insufficient pleading. We claim that said petition does not state facts sufficient to constitute a cause of action, and that therefore each of the demurrers should have been carried back and sustained to said petition, because it is not therein stated or shown that the whole amount, the $1,000,000 of said capital stock had been subscribed for, and because it is only alleged that the assessments or calls were made on the stock subscribed for, without stating that the whole amount of said stock had been subscribed for.

Said Bridge Company was organized under the act of 1866 (pp. 124 to 138,) in relation to incorporated companies. From the third subdivision of § 3, we see that by that act the amount of capital stock necessary to carry out the object of the company was required to be stated in the certificate, which was done, and by those who organized the company, determined to be $1,000,000. By § 5 of said act the books of subscription were required to be kept open till the whole amount of the capital stock was subscribed; and by § 19 we see that "whenever a call is made *upon the capital stock of the company*," notice of the making of such call was required to be given in a specified manner, and if the installments

called for were not paid, power was, by that section, given to bring a civil action to collect the same; or, if the directors chose, they might sell the stock upon which the installments remained unpaid, in the manner and on a notice in said section specified. And then, if the installment was not paid by the proceeds of such sale, the remainder of such installment might, under that section, be recovered by an action against the subscriber, thus giving great powers against a stockholder not conscionable as against one who only undertook to pay in $5,000 when $995,000 was required to be paid by others, yet, who (if the amount claimed can be collected of Hunt) must not only pay without others being liable or required to make up and pay said $995,000 required to carry out the object which he was to assist in, but then, must, under the laws on that subject, be liable to pay another $5,000 to creditors of the corporation. (Const. of Kas., art. 12, § 2.) We think, from the parts of said act referred to, it is evident that the legislative power intended the calls mentioned in said §19 to be made *upon the capital stock of the company*, not merely upon a part thereof, and we claim that the Bridge Company had not power, either by its directors or otherwise, to make any call or assessment upon any subscription or on any of its capital stock, until after the whole thereof was subscribed for, and that such subscription for the whole of the capital stock should have been averred in the petition. *Topeka Bridge Co. v. Cummings*, 3 Kas., 55; 32 N. H., 363; 38 N. H., 124; 34 Md., 318, 331; 39 Maine, 571; 1 Am. Law Reg., 33; 2 Gray, 277; 8 Cushing, 110; 6 Pick., 23; 31 N. Y., 273, 280; 48 Maine, 451. In the case in 14 N. H., 543, the capital stock was fixed by the corporators at $500,000, and it was held that all must be subscribed for before assessment could be made. That part payment is no estoppel, see 45 Me., 524; 1 Redfield on Railways, 178–194, notes, 3, 4, 5, and p. 197. And from these cases we think it apparent that assessments cannot be made on capital stock of a corporation *until after* the whole thereof has been subscribed for, unless there is something in the charter or the law affirma-

tively giving powers so to do; (1 Am. Law Rep., 33; 34 Md., 318, 332;) and we submit there is nothing in said act of 1866 giving such power.  But, even if we are wrong in this because of, and, so far as that matter may be affected by the following words, to-wit, "And may dispose of the residue of the capital stock, at any time remaining unsubscribed, in such manner as the stockholders, for the time being, may prescribe," contained in § 10 of said act, then we submit it was incumbent on the Bridge Company to have shown that such disposition of such residue was made; and that then, notwithstanding such disposition thereof, such residue should still have been assessed, and calls made thereon, or rather that the calls mentioned in § 19 should, notwithstanding such disposition of such residue, be made *on the capital stock of the company*, and not merely on so much thereof as should have been subscribed for.  Power to *dispose* of stock is not power to *annihilate* it.  It possibly may be that such power to *dispose* would authorize the making of a contract to pay necessary material or labor in the capital stock of the company, the material and labor to be furnished or performed in payment of calls, perhaps for some other purposes; (though as to that see 20 Ohio St., 199–208, and 17 Ohio, 187.)  But for what purposes or in what manner such residue might be disposed of, and whether such disposition would exempt the part disposed of from liability to calls and assessments, or not, is immaterial in this case, for want of any allegation of such disposal.

And we further submit that neither the authority given in said § 10, to the directors, to "employ the capital and means of the company in such manner as they shall deem best for the company," nor the requirements on the directors prescribed in the latter part of said § 10, nor the authority given in said § 5, to the directors "to transact all business of the corporation," nor any other general words contained in said act, conflict with our claim that *calls* or *assessments* cannot be made on any of the capital stock of the company until after the whole thereof has become liable to calls and assessments,

because of having been subscribed for, for the reason that said act being a general act, providing for the creation and regulation of incorporated companies, including the matter of their organization, management, etc., from commencement thereof, so long as said act and the corporation should remain in existence, therefore the whole act should be construed together, with reference to the entire objects and purposes thereof, the different parts thereof, when with reference to special matter, to be construed as controlling such special matter, to the exclusion of general words found elsewhere in the act. We believe it to be a well-settled rule, that where a *general intention* is expressed in a statute, and the act also expresses a *particular intention,* incompatible with the general intention, such particular intention shall be considered as an exception. (Sedgwick, 423.) If we are right in this, then, as it appears by § 19 that calls when made were to be upon the capital stock of the company, thereby clearly meaning upon the amount of capital stock, determined, as specified in § 3, to be necessary to carry out the object of the company, it follows that the said § 19, and that part thereof which shows and indicates *such intention,* should be held as an exception to the general words in other parts of said act, above referred to — as the matter of making calls, and on what they could be made, is, in view of the whole act, and of its entire object and purposes, a special or particular matter. As to the general words, powers and requirements above referred to, we submit they do not, when considered with reference to the objects and purposes of said act, in any manner conflict with our claim, or at all indicate that calls or assessments could be made on a part only of the capital stock of the company. Power "to transact all business of the corporation," would of course only be power to transact such business as the corporation had on hand, or might from time to time properly transact, including the matter even of "to some extent looking after the subscriptions from the time of their election." And the same can be said of the matter of "the general management of the affairs of the company," and of

the "employment of the capital and means of the company." The affairs of the company would vary, and be different at different times, and during the different stages of its existence, and when it had capital and means the directors might employ the same; but, such power would not be any reason why it should be enabled to collect capital or means from a subscriber for stock, before calls were authorized to be made, nor any reason why the affairs of the company should be otherwise or different than as specified, authorized, or required by the other provisions of the act. And see *P. & R. I. Rly. Co. v. Preston,* an Iowa case, reported in 1 American Law Reg., 33.

We submit that the question as to whether the corporation is fully created, when one-tenth of the capital stock has been subscribed, and the directors elected, or not, has nothing to do with any question involved in this case. When or how a corporation is created, is immaterial to the matter of construction of a contract of subscription for any of its capital stock, and it is not material in this case to inquire when the company could proceed to carry out the object of its creation. We think this fully shown by the cases above cited. The subscription when accepted creates a contract between the company and the subscriber, (which acceptance cannot be made until the corporation is first created and in being,) the terms of which are defined by law: 3 Kas., 77; 38 N. H., 124. The subscription paper in this case is in substance like that in 3 Kas., 75, and several of the other cases above cited. The contract only requires the subscriber to pay such calls as shall be lawfully made after the capital stock (in this case the $1,000,000 capital stock of the bridge company) shall have been taken *bona fide,* as above shown. A reference to the several cases above cited will, we think, show that the contract of a subscriber for stock is not in any manner affected by any question as to what power or right to act the company is possessed of before all the stock is subscribed for, nor would any act of the corporation, or subscriber, affect the construction or meaning of the contract

of subscription: 39 Maine, 572, 583; 45 Maine, 524; 1 Redfield on Rlys.; 38 N. H., 126. These authorities show the doctrine of estoppel has no application as between the company and a subscriber for a part of its capital stock. Of course, the company at all times knew the amount of subscriptions to its capital stock, for which reason, independent of any other, there could be no estoppel. See the opinion of this court in the case of *Clark v. Coolidge*, 8 Kas., 189, and 20 Conn., 104; 49 Me., 153; 26 Cal., 23; 47 N. H., 494; 37 Penn. St., 384; 7 Texas, 288; 10 Cush., 408; 25 Vt., 273; 23 Pick., 256; 25 Ind., 459; 10 Ohio, 288; 17 Md., 212. For which reason the allegations in the petition, about consent and approval of Hunt to the making of the contract with Boomer & Co., and the alleged completion of the bridge, as well as the allegations contained in the reply to the 3d defense, are immaterial to any question involved in this case, as such matters could not create an estoppel, or affect the interpretation, or meaning or effect of the contract of subscription; 3 Kas., 77, in which case a bridge was claimed *to have been built.*

As the Bridge Company has alleged, as shown in its petition and reply, in substance that Boomer & Co. built the bridge and completed the construction thereof, under the contract therefor between the said Boomer & Co. and the Bridge Company, it follows that even Boomer & Co. cannot look to, or require payment therefor, either in whole or in part, from Hunt, either as being liable on the contract for the construction of the bridge, or on any implied assumpsit. 28 Ill., 378; 28 Me., 492; Chitty on Con., 24, notes *a*, and 2. The Bridge Company does not pretend that Hunt was a party to that contract, nor does it pretend that he ever promised that the Bridge Company would comply therewith, or that if it did not, that he would assume its liabilities to Boomer & Co. Nor does the Bridge Company in said petition, or in said reply to said 3d defense, claim that it needs money with which to pay Boomer & Co. for the construction of the bridge; nor does it pretend that it is in debt to Boomer &

Co. on that contract, or that it has failed to procure sufficient money with which to pay for the construction of the bridge. Nor has said company alleged any expense other than the construction of the bridge, at a cost of $699,499, and by the 3d and 4th defenses it appears that Boomer & Co. were to take $175,000 of said $699,499, in stock of the company, leaving only $524,499 to be paid in money; and if the bridge is completed the presumption is that they got their pay as the work progressed, (in the absence of allegations to the contrary;) but even if they did not, as the Bridge Company admits Hunt has paid $2,000, which was more than his proportion — or would be if the whole of the capital stock had been subscribed — there surely is not any equity shown against him; but on the contrary, it is evident that the present controllers of the Bridge Company wish, as against Hunt, an unreasonable and unjust construction of the act of 1866, to enable them by means of such last-mentioned contracts to take money from him to be divided among the controllers of the "ring" manipulating such contracts. But if Boomer & Co. have any cause of action or ground of complaint for any cause whatever against Hunt, that is a matter for them to assert. The Bridge Company may not vicariously enforce any supposed rights or claims of Boomer & Co.: 2 Black, 513; *Gray v. Ulrich*, 8 Kas., 112.

There is a very great difference between a corporation and the stockholders therein, shown and exemplified by many cases; among others it is shown in 12 Met., 384, that the corporation and shareholders therein are separate and distinct persons in law; indeed we suppose no one will deny but that the Bridge Company has, in contemplation of law, a distinct individuality and person, independent of its stockholders and all other persons.. The copies of the pretended contracts mentioned in the pretended subscription of the Chicago & S. W. Rly. Co. referred to in the 3d and 4th defenses show that the pretended $200,000 subscription by that railway company, even if made by it, was not a *bona fide* subscription, but that, on the contrary, it was made merely to enable that

28—11 KAS.

railway company to have a voting power, so as to enable it, with such others as shall collude with it, therewith to control stockholders' meetings by outvoting the *bona fide* subscribers in the matter of electing directors, and otherwise determining the destinies of the company. Therefore we submit, that that pretended subscription of the Railway Company is void, and as the subscription of the county for $250,000 of the stock could not be paid until $300,000 of *bona fide* subscriptions should be made to the capital stock of the Bridge Company, nor paid until two-thirds of the assessment made upon all the stock other than that held by the county had been paid upon such assessment. (See page 53, Special Laws 1868.) There is no allegation of the payment of such two-thirds of any assessment, and therefore the county had not authority to pay, wherefore we submit that the county subscription cannot be counted as part of the $1,000,000 required, because of the conditions not shown to have been complied with which the law placed in its subscription. That we are correct in this, and to show that the said $200,000 pretended Railway Company subscription is void, and because of the conditions shown by the contracts therein referred to, cannot be counted as part of said required $1,000,000, see 3 Kas., 77; 48 Me., 451; 31 N. Y., 273, 283; 10 Pick., 142; 13 Eng. L. & Eq., 201; 5 Ch. Ap. L. R., 443; 8 Eq. Cas. L. R., 381; 17 Barb., 397. We suppose that as the powers of the county were thus limited, that even if the county treasurer had voluntarily paid assessments, without the evidence mentioned on page 53, Special Laws 1868, that he would not be entitled to any credit for such payment, and if he should have used the moneys of the county to pay the same with, the county could recover the same back; though, as it is not pretended that the $1,000,000 has been subscribed for, it is probably not necessary to pursue that inquiry. If the Bridge Company can, without showing that all its capital stock has been unconditionally subscribed for by persons competent to contract, recover the unpaid part of the $5,000 subscribed for by Hunt, then, instead of his subscription having the effect of making

him a party to a transaction, which, if carried out according to its spirit and intent, would have given him unincumbered stock in a corporation with capital sufficient to carry out its object without sinking his stock beneath a heavy debt, (or any at all,) will take from him his $5,000 and leave him nothing but $5,000 in amount of stock in a heavily indebted and doubtless insolvent company, controlled mainly by the $200,-000 voting power given said Railway Company without payment therefor; and then, if Hunt is now liable to the pretended calls, he will hereafter of course be liable as a stockholder to creditors of the corporation to help make good such sums as the company would have had if the $1,000,000 of its capital stock had been subscribed for so far as needed to pay creditors with. And those contracts with the Railway Company go far to show the wisdom and justice of the rule requiring all the stock to be *bona fide* subscribed for by persons competent to contract, before calls can be made.

2. We claim that the so-called certificate of organization set forth in the petition, is void, because the termini or boundaries within which the company desired the privilege of corporate rights was not specified in that certificate, as required by the 2d subdivision of § 3 of the aforesaid act of 1866; (29 Cal., 124;) that therefore the petition in the district court is defective; (3 Kansas, 77, 78.) The place of its intended operation is of course a very different matter from such termini or boundaries, especially in view of the exclusive rights mentioned in § 4 of said act. A corporation operates, wherever it transacts business, makes contracts, etc. But the termini or boundaries mentioned in said 2d subdivision have reference to a place of location. And we submit that said pretended certificate is also void, because the object therein specified as that for which the company desired to be incorporated was therein stated to be—to make, build, construct, equip, furnish, manage, work and control a railway, wagon and foot-bridge across the Missouri river, in the state of Kansas, and within the county of Platte in the state of Missouri, subject to such rules and regulations as to freight

and tolls or otherwise, as, etc.; from which statement of said objects, it is apparent that it was intended to create a corporation with franchises *local* in their nature, extending into and *located* in the state of Missouri. We submit that it is not within the power of any state to grant such corporate rights and franchises as the objects aforesaid, so far as the same are of a local character, and extend into another state. Without the Missouri part of said objects, the whole thereof fails. And of course it was not competent for the legislature of this state to authorize any persons to locate a bridge, or to collect tolls thereon, either in whole or in part, in the state of Missouri. To do so would be usurping the sovereign rights and prerogatives of the state of Missouri. So far as that state is concerned, the franchise sought to be obtained by said certificate could only be had under an affirmative law of Missouri granting the same. 1 Black, 603; 11 Wend., 587; 13 Howard, 518; 3 Wallace, 714, 726. See also, *The L. G. Rly. & Trust Co. v. Coffey Co.*, 6 Kas., 245.

But we submit the law-making power of Kansas did not, by said act of 1866, pretend to give power to any persons to create a corporation local in its nature, either in whole or in part, or to be located, either in whole or in part, outside of this state, and that therefore it is not necessary to consider the question as to whether this state could create a corporation with such powers and franchises as those claimed by the defendant in error. And if we are right in this, it of course follows that said certificate is void; and if it is void for any reason, it of course follows that defendant in error has no existence; and if it has not, (as that is shown by said certificate set forth in its petition,) for that reason its petition was defective, and the demurrer should have been sustained thereto: 3 Kas., 77.

In relation to our claim that said act of 1866 did not authorize the construction, or creation of a corporation to construct, a bridge over the Missouri river, partly within the limits of another state, with local franchises there, (and the right to build a bridge of course is a mere franchise,) local in

its nature, in addition to the authorities above cited, we refer to the rule that "a corporation can only do such things as it is by law authorized to do; any act by it done beyond the power conferred upon it, is illegal, *ultra vires,* and void; and all powers not conferred on a corporation are withheld and denied, just as much as if the legislature had used express negative language for that purpose." 9 How., 172; 13 Peters, 519; 44 Barb., 625; 7 Wend., 412; 13 Minn., 64–5; 30 Eng. L. & Eq., 120; Pierce, 397; 1 Southern L. Review, 5; 56 Penn. St., 413; 3 Head, 337. And also to the rules and maxims of the law, that a sovereign (Kansas) is not to be presumed to have authorized the commission of acts of usurpation in the state of Missouri, and of course the building of a bridge as contemplated by the certificate aforesaid, would be and was a usurpation in the state of Missouri, an offense against the dignity of that state, and if attempted to be authorized by this state, a violation of the principles of comity which should regulate the intercourse between the states, and a plain, but void attempt to exercise the right of granting local franchises and privileges in the state of Missouri which could be there, and there only, exercised or enjoyed. Of course, in the absence of any express authority in said act so to do, it is not to be inferred against the law-making power of this state, that it has attempted to grant any such rights or privileges as claimed and stated by the objects aforesaid. It is no answer to this to pretend that the state of Missouri has suffered or permitted any bridge to be built, or to refer to any act of congress on the subject; and it will be borne in mind that the defendant in error sued only as a corporation claimed to have been organized under said Kansas act of 1866. A corporation indued with the capacities and faculties it possesses by the co-operating legislation of the two states, cannot have one and the same legal being in both states. Neither state could confer on it a corporate existence in the other, nor add to, or diminish the powers to be there exercised. *Ohio & M. Rld. Co. v. Wheeler,* 1 Black, 286; 3 Kas., 55, and 77; 9 Minn., 158; 6 Kas., 245. In this connection we also refer

to 23 Wendell, 193; 5 Hill, 383; 39 Penn. St., 337; 10 How. Pr., 543. We also refer to the following about acts *ultra vires:* 17 Barb., 581; 5 Am. L. Law Reg., N. S., 733, 744; 1 Redfield on Rlys., 589, 620; 17 How., 30; 33 Barb., 578; 56 Penn. St., 413; 21 How., 442; 18 Abbott's Pr., 419; 15 Ind., 395; 10 Ohio St., 372.

*Stillings & Fenlon,* for defendant in error:

Plaintiff in error seems to rely on the doctrine of the case of *Topeka Bridge Co. v. Cummings,* 3 Kas., 55. The Topeka Bridge Company was organized under a special charter, approved February 14, 1857, which declared in express terms that the capital stock shall be $100,000, and having no clause or provision for an organization with any less sum as the capital stock; while the Kansas & Missouri Bridge Company was organized under the general incorporation law of 1866, which provides for an organization, such as the petition in this case shows was made. We are unable to see how the Topeka Bridge Company case can have any force in establishing a rule for construing the charter of the Kansas & Missouri Bridge Company, inasmuch as it relates to a far different law; and to avoid the effect of the decision in the Topeka Bridge Company case, or similar ones, it is fair to presume the law of 1866 was enacted. The law of 1866 authorizes the borrowing of money and the contracting of debts, and all other acts which may be done by a corporation as fully when the ten per cent. of the capital stock is subscribed, and the organization effected, as at any other time. In fact, the entire law seems to have been framed to avoid the embarrassment to the employment of the means of a corporation, which the construction of the charter in the Topeka Bridge Company seemed to impute. In practice, as we all know, it is the rule that only an inconsiderable proportion of the capital stock of a corporation in this western country is taken before the enterprise is pushed forward, and further subscriptions taken as the work progresses. In our system of constructing railroads it would have been impossible to procure the aid of counties

under the construction claimed by plaintiff in error. According to the view of plaintiff in error the capital stock must all be taken before the corporation has vitality to do anything, and therefore none could be subscribed as the work on the road should be pushed from one county to another, as the practice has been in this as in all other western states. To say that the company is authorized to carry out the purposes of its organization, and yet that it cannot call for a dollar of its subscription to the capital, it seems to us is absurd in the extreme. The most reasonable view is, that the legislature had in view the actual situation and wants of a. young and growing state, and recognized the fact that almost all corporations in this state commenced their enterprise with but a part of their stock subscribed, and relied on obtaining further subscriptions as the enterprise should be forwarded, and should commend itself to the interests of those to be benefited by it, and that the act of 1866 was passed to. meet the exact situation, and was intended in this respect to be different from the charter in the Topeka Bridge Company. In support of this view we refer to the case of the *Ashtabula & N. L. Rld. Co. v. Smith*, 15 Ohio State, 328, construing a law similar in its provisions to ours, and to 18 Indiana, 452, which fully sustains, as we understand it, the principle relied on by the court below. And also as bearing on and sustaining the same view, we refer to 24 Md., 563; 8 Blackf., 584; 1 Kernan, 102; 1 Disney, 84.

The subscription in this case, or contract to pay, as written and signed, is a promise to pay on call of the directors, and is binding when the ten per cent. shall be subscribed and the organization effected, unless the law so qualifies it as to require the whole amount to be subscribed before any call can be made. The purposes of the law are to be considered; and we have as yet heard no reason why the law should permit the organization and authorize the corporation to proceed in their enterprise on the stated per cent. of the capital stock, and to dispose of the unsubscribed capital stock, unless it was intended that the stockholders and directors composed a body

corporate with full power to do all that a corporation could do in such matters after the organization prescribed by the statute. In furtherance of this view we may add that it has always been a recognized right of a corporation to issue preferred stock of various kinds after its organization, and as means of forwarding the enterprise: 8 Mich., 100; 49 Me., 491; 2 Redfield on Rlys., 516; 15 Ind., 395; 50 Barb., 247. And the issue of preferred stock was no defense to a subscription: 2 Rogers, 673; 26 Vt., 452; 1 Peters, 46. All of the cases where the courts hold that the entire amount of the capital stock shall be subscribed before a legal assessment can be made or enforced, are cases under charters expressly or impliedly requiring the entire subscription as a prerequisite to the legal existence of the corporation, and to the exercise of any corporate functions; but we believe the authorities are uniform in deciding that corporations existing under laws like ours, and possessing powers similar to those conferred by the provisions of the act of 1866, may enforce the collection of subscriptions, although the full amount of stock has not been subscribed. If the construction claimed by plaintiff in error prevails, we venture the assertion that four-fifths of the corporations under the general corporation law of Kansas, are invalid. The construction claimed by plaintiff in error would utterly annul many of the sections of the act of 1866, whereas every section can be harmonized and given effect under the ruling of the court below. A. & A. Corp., 107; 19 N.Y. 119; 2 Barb., 202; 5 Bing., 521; 2 Metc., (Ky.,) 323.

The opinion of the court was delivered by

VALENTINE, J.: The principal questions involved in this case are as follows: First, Has the legislature of the state of Kansas the power to pass an act authorizing the organization of a corporation to build a bridge across the Missouri river at a place where said river forms the boundary line between the state of Kansas and the state of Missouri? Second, Has the legislature passed any such act? or in other words, did the act of February 27th 1866, (Laws of 1866, page 124,)

concerning corporations, authorize the organization of a corporation for such a purpose? Third, Did the Kansas and Missouri Bridge Company, in effecting their organization, comply with all the requirements of said act? Or to be more particular, Did the corporators describe sufficiently in their certificate of incorporation the location of the bridge and the boundaries within which they desired to claim corporate rights? (Laws of 1866, p. 125, § 3, subdiv. 2, and §§ 29, 31.) The description in said certificate was as follows: A "bridge across the Missouri river, from the state of Kansas to the state of Missouri, at some point within the county of Leavenworth in the state of Kansas, and within the county of Platte in the state of Missouri." Fourth, Could the stockholders of the bridge company legally organize for the transaction of corporate business, as they claim they did, before all the capital stock of the company had been subscribed for? Or to be more exact, could they so organize when only ten per cent. of the amount had been subscribed? (Laws of 1866, pp. 126, 128, §§ 5, 10.) And if the company could so organize, could they then compel each stockholder to pay the full amount of the stock for which he had subscribed, when only one-tenth of the capital stock of the company had yet been taken by individual stockholders?

These questions were all raised by two demurrers, one to the fourth defense set up in the answer, and the other to the plaintiff's reply. It is conceded, and even claimed by both parties, that these demurrers may be carried back to any preceding pleading, and sustained as to the first insufficient pleading. This we think is correct, so far as this case is concerned. The demurrers were based upon the ground that the pleadings to which they were respectively intended to apply did not state facts sufficient, the first to constitute a sufficient defense, and the second to constitute a sufficient reply to the answer. These demurrers undoubtedly raised the question as to the sufficiency of all the pleadings—the petition, the answer, and the reply—so far as either attempted to state a cause of action, a defense, counterclaim, or set-off, or a reply

to the answer. In other words, when such a demurrer as either of these two is filed, the court examines the whole record, and renders such a judgment as should be rendered upon all the pleadings taken together. Such a demurrer however never raises such questions as are deemed to be waived by not being *specifically* raised by demurrer or answer. (Gen. Stat., 648, § 91.) The court below sustained said demurrers as to the third and fourth defenses stated in the answer, and to these defenses only, and the defendant (plaintiff in error) now seeks in this court to have said rulings of the court below reversed. It seems however to us that the rulings of the court below must be sustained, and that all the foregoing questions must be answered in the affirmative.

I. We have no doubt concerning the power of the legislature to pass an act for the incorporation of a company to build a bridge, part of which shall be in Kansas and the other part in Missouri. If such a corporation cannot be organized in Kansas, then for the same reason such a corporation could not be organized in Missouri. If a Kansas corporation cannot build a bridge across the Missouri river, then for the same reason a Missouri corporation could not build such a bridge. And if neither a Kansas nor a Missouri corporation can build such a bridge, then for the same reason neither of them could build by itself or with the other any part of that portion of the bridge which may not be located in its own state. It has already been settled that the two states acting together could not create a single corporation for such a purpose, or for any other purpose. (*Ohio & Miss. Rld. Co. v. Wheeling*, 1 Black, 286, 297.) Hence, it necessarily follows that no corporation, wherever or however organized, can build the whole of such a bridge; and no two corporations acting together, although one might be organized in Kansas and the other in Missouri, could build it jointly, or in common; for the Kansas corporation would be beyond its jurisdiction in Missouri, and the Missouri corporation beyond its jurisdiction in Kansas. Each corporation would therefore have to build, own, and operate separately and

independently that portion of the bridge which might be located in its own state, and that portion only. Can this be law? We think not. A corporation of either state may build, own, and operate the whole of the bridge. It is true however, that the corporation that builds, owns or operates the bridge, must have the consent of both states in order to do so. But the consent of the state which authorizes the organization of such a corporation is necessarily given when the authority for the organization is given; and it must be presumed, in the absence of anything to the contrary, that the consent of the other state is given, for such consent, in our judgment clearly falls within the rules of comity between states. (*L. G. Rly. v. Comm'rs of Coffey Co.*, 6 Kas., 254; *Runyan v. Coster's Lessee*, 14 Peters, 122; *Bard v. Pool*, 12 N. Y., 495. See also in this connection *Conway v. Taylor's Executors*, 1 Black, 603, 629, 630, and cases there cited.

II. The act is broad enough as we think, to cover all bridges which any corporation can get legal power from any state or person to build. Corporations may under said act be organized for the purpose of building one bridge alone, or for building a sytem of bridges. (Laws of 1866, pp. 124, 133, §§ 2, 29.) A case may easily be imagined where it would be necessary for a Kansas corporation, organized for the purpose of building a system of bridges, to build a bridge wholly within the state of Missouri, in order to render their bridges built in Kansas of much service, or of much value. The act is broad enough, and was probably intended, to reach just such a case as this, as well as other cases. We have no doubt but that a Kansas corporation (without reorganizing as a Missouri corporation) could with the consent of Missouri build just such a bridge. We know of no good reason why we should limit the terms of the act by judicial construction, when the legislature has not seen fit to limit the terms of the act by legislation.

III. Was the company duly organized under said act? The certificate of incorporation should have stated more specifically and definitely the "*termini* or boundaries within

which such company * * * desired the privilege of corporate rights." (Laws of 1866, p. 125, § 3, subdiv. 2; pp. 133, 134, §§ 29, 31.) But still we do not think that the statements are so absolutely indefinite or defective as to render the organization of the company wholly illegal and void. At most, the organization is not so wholly void for that reason merely that the question of its validity may be raised in a collateral manner, as it is attempted to be done in this case. Besides, the defendant (plaintiff in error) participated in the organization of the company, becoming a director therein when it was first organized, and acting in that capacity; and it would now be a gross fraud upon the other stockholders, after they have paid for their stock, built the bridge, and assumed additional liabilities, for him to say that the company never had any legal or valid existence. He should be estopped from setting up any such fraudulent and unconscionable claim. (*Hager v. Cleveland*, 36 Md., 476, 490, 491; *Eaton v. Aspinwall*, 19 N. Y., 119, 121.)

IV. We think the corporation was created when the certificate of incorporation was filed with the secretary of state. In the said act concerning corporations the persons who execute and sign the certificate are called "corporators;" (Laws of 1866, p. 125, §§ 3, 4.) The certificate is called a "certificate of incorporation;" (§ 5.) And section 4 of the act provides "That when the foregoing provisions," that is, the making and filing of *said* certificate, "have been complied with, the persons named as *corporators* in said certificate shall have the exclusive right to carry into effect the object named in said certificate, in accordance with the provisions of this act, and within the limits and boundaries named in said certificate; *and they and their associates,* successors, and assigns, by the name and style provided in said certificate, *shall thereafter be deemed a body corporate,*" etc. (Laws of 1866, p. 125; and see also, Gen. Stat., 192, § 10.)

V. We think the company could legally organize for the transaction of corporate business when only ten per cent. of the capital stock of the company was subscribed. This

organization is effected by the election of a board of directors, and other proper officers, as provided in § 5 of the act of 1866. And when the company is thus organized we think they may compel each stockholder to pay the full amount of the stock for which he has subscribed, although only one-tenth of the capital stock has yet been taken by individual stockholders. The power to make assessments on the capital stock seems necessarily to follow from the power to transact corporate business. If a bridge company has power to build a bridge, they must necessarily have power to make assessments on the capital stock in order to do so. It requires money to build bridges, ferries, railroads, turnpikes, colleges, and the various other improvements authorized to be constructed and operated by said act of the legislature; and it can hardly be supposed that the legislature intended or expected that the various corporations organized under said act should proceed to build and operate these various objects without any money, or without making any calls upon the capital stock. The question we are now considering seems to be the most important question in the case. It is purely a question of statutory law however, and depends upon the statutes of our own state. Hence it makes but very little difference what other courts have decided upon this question, unless their statutes are substantially like ours. The substance of our statutes affecting this question, will be found in the Laws of 1866, pp. 124 to 138, ch. 57, "an act to provide for the creation and regulation of incorporated companies." The substance of § 4 of said chapter has already been given. Sec. 5 provides that the persons named in the certificate of incorporation shall cause books to be opened for subscription to the capital stock of the company; but neither this nor any other section requires that anything be paid at the time of making the subscription; nor does this or any other section require that anything be paid by the subscribers at any other time except upon "a call" of the company. Said § 5 also provides that whenever ten per cent. of the capital stock of the company shall be subscribed an election shall be held for

the purpose of electing directors of the company; and that—

. "A majority of said directors [elected at said election] shall form a board, and be compctent to fill vacancies in their board, and to transact all business of the corporation. An annual election shall be held for directors, at such time and place as the stockholders, at their first meeting, shall determine, or as the by-laws of the corporation may require; and the directors chosen at any election shall, so soon thereafter as may be convenient, choose one of their number president, and shall appoint a secretary and treasurer of the corporation. The directors, before entering upon their duties, shall each take an oath or affirmation faithfully to discharge his duties, and they shall, from time to time, make such dividends of the profits of said company as they may think proper.

"SEC. 6. All deeds conveying real estate belonging to any corporation, shall be signed by the president and secretary, with the seal of the company attached.

"SEC. 10. The directors shall have the general management of the affairs of the company, and may dispose of the residue of the capital stock at any time remaining unsubscribed, in such manner as the stockholders for the time being may prescribe, and may employ the capital and means of the company in such manner as they shall deem best for the company. They shall cause a record to be kept of all stock subscribed and transferred, and of all business transactions, and their books and records shall at all reasonable times be open to the inspection of any and every stockholder. They shall also, when required, present to the stockholders reports in writing of the situation and amount of business of the company, and declare and make such dividends of the profits from the business of the company, not reducing the capital stock while they have outstanding liabilities, as they shall deem expedient."

SEC. 19. [This section provides for making "calls" upon the capital stock of the company, and for collecting the amounts called for.]

The contract of subscription reads as follows: "We, the undersigned, hereby subscribe to the capital stock of the Kansas and Missouri Bridge Company for the number of shares set opposite our respective names, and bind ourselves, our heirs, executors and administrators to pay for the same, at the rate of one hundred dollars per share, at such times

and in such installments as the stockholders or board of directors may hereafter determine, five per cent. of which is to be paid at time of subscription." The plaintiff in error (defendant below) was the first person who subscribed for stock and who signed this contract of subscription. We suppose it will be everywhere conceded that ordinarily, and in all cases, unless otherwise provided by the act authorizing the corporation to be created, or by the charter of the company, or by the contract of subscription, all the capital stock of a proposed corporation must be subscribed for by *bona fide* stockholders before any stockholder can be compelled to pay any assessment on his stock, or before the company can enter upon any of its corporate business, or before even any kind of a corporate organization can be effected. At least, we shall decide this case upon this theory. This disposes of all the authorities upon this question referred to by counsel for plaintiff in error; for none of them profess to go further, or even admit that they go any further than we have thus recognized the law to be.

All corporations are organized in this state under general laws. The present corporation was organized under the said laws of 1866. And said laws authorize, as we think, the organization of a corporation just as this was organized. And when the corporation is thus organized it may go into full operation at once, as such corporation. It may enter at once upon its corporate business, and may at once make assessments upon the stock of the shareholders up to the full face of their stock, although only ten per cent. of the capital stock has yet been subscribed. With respect to the present corporation, not only the law, but also the contract of subscription, authorizes the organization of a corporation just as this was organized, and authorizes assessments on the stock to be made, just as they were made in this case. It will be admitted that the statutes do not *in express terms* authorize assessments to be made on the shares of stockholders as soon as the company is organized by the election of directors and other proper officers, and before all the stock is subscribed for; but we

think they do by unavoidable implication. If the company after its organization can do nothing but receive subscriptions to the capital stock until the whole of the capital stock is subscribed, where is the propriety of allowing an organization of the company at all where only one-tenth of the capital stock is subscribed? Why go through with the farce of electing directors, a president, a secretary, a treasurer, etc., if such officers can do nothing but receive subscriptions to the capital stock? The original corporators are the proper persons to receive subscriptions, and to do everything else connected with the corporation until the company is completely organized for corporate business. This right belongs exclusively to them. Sec. 4 of said act of 1866 provides that "the persons named as corporators in said certificate shall have the exclusive right to carry into effect the object named in said certificate, in accordance with the provisions of this act." It is not necessary under the law that anything be paid on the subscriptions until after the organization of the company is completed; but if anything should, under the contract of subscription, be paid sooner, it may be paid to the original corporators, and taken care of as well by them as by the subsequent directors or by any other persons or officers. Until directors and other proper officers are elected, indeed, in our judgment, until the corporation may enter fully upon its corporate functions, the original corporators are the representatives of the corporation, and are the only persons authorized to attend to the preliminary business of the corporation. The directors when elected are elected (in our judgment) to do the business of a completely-organized corporation. They are not elected for the purpose of effecting an organization. That is the business of the original corporators. They are elected to attend to the business of the corporation after its organization. But if they are not, if they are elected only for the business of receiving subscriptions until the whole of the stock shall be subscribed, why say, as the statute does, that a majority of the directors elected at the organization of the company shall be a board of directors, and be competent

"to transact *all business* of the corporation?" And why allow the first directors chosen, as well as those subsequently chosen, to "dispose of the residue of the capital stock at any time remaining unsubscribed, in any manner as the stockholders for the time being may prescribe, if the stock can be disposed of only by subscription, and if all of it must be disposed of by *bona fide* subscriptions before any act can be done by the company as a corporation? The only theory upon which said unsubscribed stock can be disposed of in any other manner except by subscription is, that the company is completely organized for the transaction of corporate business, and that such unsubscribed stock belongs to the corporation as such. If however all the stock must be subscribed before the directors have the power to act as directors, or to do any act except to receive subscriptions for stock, the stock must all be subscribed, and in the hands of individual stockholders, and beyond the reach of the directors, or even the stockholders as a body, before the directors or the stockholders as a body can have any control over it, or can dispose of it in any manner except by subscription, this makes the law absurd. The directors are authorized to do what they cannot possibly do. But if they could so dispose of the unsubscribed stock, why authorize them to sell the unsubscribed stock when they cannot make an assessment of a dollar on the subscribed stock? And does it not look absurd to give to the first directors, as well as to those subsequently chosen, the power to declare dividends of the profits of a corporation before the corporation has gone into operation at all, before it can possibly have a dollar of profits to divide, or even before it may have received a dollar on subscription, or from any other source? The construction that we have given to said act of 1866 is the only natural construction that can be given to it; and it is the one that has been universally given to it in practice, so far as we are informed. The act authorizes the organization of over thirty different kinds of corporations, including railroad companies, and of course all stock corporations which are organized under it must be governed by its

29—11 KAS.

provisions, and by the same provisions that governed the organization of this bridge company. And so far as we are informed, such corporations have been organized and have proceeded to business just as this bridge company has done. Under the provisions of the act of 1865, (Laws of 1865, p. 94,) railroads were organized substantially in the same manner as they are under the act of 1866; subdivision 4 of § 3 of the act of 1865 corresponds to subdivision 3 of § 3 of the act of 1866. Section 8 of the laws of 1865 corresponds to § 5 of the act of 1866. And amended § 6 of the laws of 1865, (page 105,) corresponds to § 19 of the laws of 1866. The act of 1865 was the first general law for the incorporation of railroad companies ever passed in this state. The act of 1866 was the second; and the act of 1868 (ch. 23, Gen. Stat., 190,) was the third and last. The most of the railroad companies of the state are governed by these general laws; and yet in the construction and operation of railroads, the view taken by the plaintiff in error (defendant below) we believe has never been followed. In our system of constructing railroads it would have been impossible to procure the aid of counties under the construction claimed by the plaintiff in error. It could, before the legislature of 1872, only be done by counties subscribing to the capital stock; but according to the view of the plaintiff in error the capital stock must all be taken before the corporation has vitality to do anything, and therefore none could be subscribed, as the work on the road should be pushed from one county to another as the practice has been in this as in other western states. To say that the company is authorized to carry out the purposes of its organization, and yet that it cannot call for a dollar of its subscription to the capital stock, seems to us absurd in the extreme. The most reasonable view, as we think, is, that the legislature had in view the actual situation and wants of a young and growing state, and recognized the fact that almost every corporation in this state commenced its enterprise with but a part of its stock subscribed, and relied on obtaining further subscriptions as the enterprise should be

forwarded and should commend itself to the interests of those to be benefited by it, and that this law was passed to meet the exact condition of affairs. The case of the *Topeka Bridge Co. v. Cummings,* 3 Kas., 55, does not in any manner affect the question now under consideration. But see the following cases as throwing some light upon the present case: *N. H. & Derby Rld. Co. v. Chapman,* 12 Am. Law Reg., N. S., 80; same case, 38 Conn.; *Hoagland v. Cin., &c., Rld. Co.,* 18 Ind., 452; *Schnectady Plank Road Co. v. Thacher,* 11 N. Y., 102; *Ashtabula Rld. Co. v. Smith,* 15 Ohio St., 328, 333; *Fry's Ex'r v. Lexington Rld. Co.* 2 Metc., (Ky.,) 323, 324; *Taggart v. West. Md. Rld. Co.,* 24 Md., 563.

The judgment of the court below must be affirmed.

KINGMAN, C. J., concurring.

BREWER, J., not sitting.